Carr, J.
The first question I shall consider in this cause, is, whether the depositions taken in the suit brought at law by Millstead against Bruce, can be read hete? Without having made up my mind as to the effect of the objection to the competency of this evidence, if the exception had been timely taken in the court of chancery, I am of opinion, that such exception taken here, at this late day, cannot avail. It is to be remembered, that the question of title, with all the children of the testator Robert Colvert, was the same; all claimed the slaves under his will. Joseph Bruce, against whom the action at law was brought, was one of those claimants, in right of his wife Isabella. The plaintiff in that suit was the same, relying on the same right which he relied on here; and the title of the defendants here, was identical with that called in question there. Indeed, Isabella the widow of Bruce was a defendant to this bill. In addition to this, we must hold in mind, that this was a question of pedigree, on which hearsay and reputation are evidence; and on which, all must admit, the depositions of these witnesses would be unquestionable evidence, if the witnesses were dead. Under these circumstances, it seems clear to me, that these depositions ought to have been objected to in the court of chancery, if any where. Thirty years ago, chancellor Wythe decided this cause on this very evidence; can we say he did wrong in receiving it, when he found it filed in the record? when *97 under certain circumstances (the death of the witnesses) it would have been clearly good? and when no objection was taken to the reading it? Again, eighteen years afterwards, chancellor Green made the same decree, upon the same evidence, without exception taken. And now, in this court of last resort, forty years after the depositions were taken (for that was in 1793-4) we are told, that they are not good evidence. Does any one imagine that a single one of the witnesses is now alive? Consider their ages in 1793. The youngest of them was then forty-nine years old, the eldest eighty: add forty years, and then tell me, whether it would be right, after all the delay which has already befallen this cause, to send it back for the purpose of ascertaining whether these witnesses are alive or dead? for if dead, the evidence is above exception. I am well satisfied, that we ought to receive the evidence, without the form of this useless inquiry.
By the will of Robert Colvert, I think (with chancellor Wythe) that a “ full dominion, a perpetual property” in one third of the slaves, after Samuel Colvert’s attainment of age, was given to his widow; in the meantime, she had the possession and ownership of the whole. I think the evidence shews, that there was a division of the slaves and their increase, partially made in 1765, while Samuel was under age, and completed in 1768, after he attained to full age; and that in this division Sue was allotted to Mrs. Millstead. The division is proved by several witnesses. No doubt Samuel Colvert, when he came of age, might have set aside this division, so far as any injustice was done him; but there is not the slightest proof that he ever objected to it. On the contrary, it would seem from the evidence of Hanson, that he assented to it; for he says that, in 1768, he was applied to by the executors, and all the representatives of Robert Colvert, to settle the estate; that they laid before him the proceedings of Smallwood and Courts, which they allowed to be a settlement, and on which he, on examining it, was of opinion they ought to abide by, so far as it went. All the witnesses say, that in the division *98 Sue was allotted to Millstead, the husband—she had many children, it seems; and in 1791, Millstead made a deed of gift of her and them to William Millstead, the original plaintiff in this cause.
The next question is, are the slaves Harry and Watt (admitted by Samuel Colvert to be in his possession) descendants of Sue ? I think this sufficiently established by the evidence.
I do not think the statute of limitations applies, 1st, because it is not relied on either by plea or answer; and 2ndly, because the appellant says, in his answer, that the slaves held by him had come into his possession in the fall of 1796, and this bill was filed in 1798. I think the decree should be affirmed.
Cabell, J. concurred.
Tucker, P.
That there was a partition of the slaves bequeathed by Robert Colvert to be divided between his wife and children at the maturity or death of his son Samuel, that it took place about the year 1765, and that the slave Sue was assigned to the widow in part of her third, are facts that I do not think can be controverted. They are stated in the bill, and are not denied by the answers which rest the defence on the division’s having been premature, without authority, and incomplete. They are moreover proved by Mrs. Woodward, the only witness in this case, though her testimony very distinctly proves that the division was imperfect and not completed. This partition, if such it may. be called, was made at least as long ago as the year 1777, since the testator, at that date, had been dead twenty years, and' Samuel was of course of age. It is, however, very probable it was made much earlier. From the time of the partition, when John Millstead was in possession of the slaves, and insisted that the allotment, so far as it had gone, should stand, we hear nothing of any portion of the slaves until 1791, when he conveyed them to his nephew William Millstead, by whom a suit was soon after insti *99 tuted for part of them, in the Fredericksburg district court. There being no evidence of a change of possession until that time, we must take it to be unchanged, and thus must presume, that John Millstead continued in possession of the slave Sue, and of course of her increase born after the partition, until some time anteriour to the year 1791. If Samuel did not arrive to full age until 1777, this was fourteen years after his maturity: if he attained to manhood about the 3ear 1768, it was twenty-three years after. During this period, we hear of no measures taken among the parties for the completion of the partition, no question made as to the allotment to the widow, no suit instituted for the purpose of compelling a new and more perfect, regular and equitable division, and no attempt to divest John Millstead of the possession he continued to hold under an allotment, which, at the time it was made, he insisted should stand as far at least as it had gone. Admitting then, as I do most distinctly, that this division was imperfect, irregular and premature, and that, in fact, it went no farther, probably, than the allotment of Sue to the widow, yet in this allotment I think we must infer a perfect acquiescence, and an acquiescence for a period between fourteen and twenty-three years.
The next question is, ought this imperfect and irregular division to be confirmed in consequence of that acquiescence ? I think it ought. There is no principle better settled, than that a partition long acquiesced in by the parties, generally, will not be disturbed for irregularity (Carter’s ex'or v. Carter, 5 Munf. 108. 114), not even by a party who never acquiesced in it, though all others concerned had done so, unless he can shew that it is unjust or unequal. It would be highly mischievous were it otherwise, particularly in this country, where divisions of estates, allotments of dower, and the like, are made with so little attention to the strict requirements of the law; Fitzhugh v. Foote, 3 Call 13. Ireland v. Rittle, 1 Atk. 542. Under these authorities, there can be no doubt, that, if this division had been completed, however irregular or premature it might be, it would now be ratified on the ground of long acquiescence. *100 Now, I think, it is not going too far to say, that, as the allotment of the widow’s part was made, as the husband insisted that so far as it had gone the division should stand, and as all concerned acquiesced for so many years in the allotment, anc] the ciaim 0f rjght under it, we must take the division as complete between the widow on the one part, and the children on the other, however incomplete it may have been as between the children themselves. There is nothing in the sanction given irregular partitions after long acquiescence, which does not fully apply to the circumstances of this case. I am, therefore, of opinion, that John Millstead was entitled to the slave Sue and her children born after the allotment.
That Harry and Watt were the descendants of Sue, born after she was allotted to Mrs. Millstead, is sufficiently proved by the depositions in the other cause, if they are to be read in this. I come then to the inquiry, how far the depositions in the action at law between Millstead, and Bruce, are evidence against Samuel Colvert, who was no party to that suit ? That the depositions were properly introduced as evidence in this suit, and that they were read upon the hearing, can admit, I think, of no doubt. The cases of the Bruces and Samuel Colvert were not distinct in the court of chancery. There was but one bill, in which these several defendants were united. It cannot be denied, that the depositions taken between Millstead and Bruce, in the action at law, were evidence as against the defendants claiming under Bruce, in the suit in chancery, and were properly filed, and must have been read as to them, upon the hearing. The depositions, then, having been read and properly read, the question still recurs, were they evidence as against Samuel Colvert, who was no party to the suit in which they were taken. I am of opinion, they could not be evidence of any facts set forth in them, except the fact of pedigree; of that, indeed, they would have been properly referred'to as evidence, if it could have been shewn, that the witnesses were dead. This, however, does not appear; and therefore, unless they were properly evidence against Sa *101 muel Colvert in toto, they cannot be used on the question of pedigree. Now, in the case of Stubbs v. Burwell, 2 Hen. & Munf. 536. it was decided, that though a deposition was regularly taken in the cause, as to one party, there having been due notice to him, yet it could not be received as evidence to afíect the interest of another party, as to whom there was no notice. Much less, then, can these depositions taken in another suit, to which Samuel Colvert was not a party, be read as evidence against him. If, pursuing the idea of the counsel, we are to take it for granted, that the chancellor reads every thing at the hearing, that appears upon the record, we are to presume he read those depositions as evidence against Samuel Colvert, then I am of opinion he erred in doing so. If he did not, then he could have had no evidence before him, to establish the fact that Harry and Watt were descendants of Sue. But as it appears upon the face of the record, that there is evidence attainable by which the fact can be established, I am of opinion, that we should send the cause back for the purpose of inquiring into that fact. To this the case of Stubbs v. Burwell is full in point; for, in that case, the depositions not being taken upon notice to Stubbs, but appearing to contain matter which would have justified the decree, if they could properly have been read, this court sent the causes back with directions to the court of chancery to afford the plaintiff an opportunity to take the depositions over again, upon giving due notice to the defendant Stubbs.
Decree affirmed.